IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICKIE BARNES,

                        Plaintiff,                        CV-07-0750-ST

          v.                                      FINDINGS AND
                                              RECOMMENDATION

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

                        Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

       Plaintiff, Micke Barnes ("Barnes"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 28 USC §§ 401-34.  This court has jurisdiction

under 42 USC §§ 405(g) and 421(d).  For the reasons that follow, the Commissioner's decision

should be AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.

## **ADMINISTRATIVE HISTORY**

1 - FINDINGS AND RECOMMENDATION

Barnes filed an application for DIB on October 14, 2004, alleging disability beginning September 23, 2003.  Tr. 69.  Her application was denied initially and upon reconsideration. Tr. 30-31, 34-36, 39-43.  She requested a hearing before an Administrative Law Judge ("ALJ") which was held on April 27, 2006, before ALJ Marilyn S. Mauer in Eugene, Oregon.  Tr. 21, 32, 422-54.  Barnes appeared *pro se*.  The ALJ denied Barnes' application in an opinion dated September 19, 2006.  Tr. 18-29.  The Appeals Council denied Barnes' request for review (Tr. 7-9), making the ALJ's decision the Commissioner's final decision.  20 CFR §§ 404.981, 422.210.

## FACTUAL BACKGROUND

I.    **Disability and Work History**

Born in 1954, Barnes was age 49 at the alleged date of onset and age 51 at the time of her hearing before the ALJ.  Tr. 69.  In her initial application, Barnes alleged she was disabled due to a combination of impairments including: congestive heart failure, diabetes, hearing loss, manic depression, rheumatoid arthritis, scleroderma, Irritable Bowel Syndrome ("IBS"), tinnitus, and Meniere's disease.  Tr. 73-82.  At her hearing before the ALJ, Barnes stated she was unable to work primarily because of her heart condition (which she described as atrial fibrillation), depression, and constant problems with diarrhea caused by her IBS.  Tr. 440-41.

Her past relevant work experience includes work as a snack bar department manager at Wal-Mart, a dry-cleaning presser and counter worker, tray packer in a processing plant, and retail cashier.  Tr. 95-99.  Although she alleges her disability began in September 2003 when she stopped working at Wal-Mart, she returned to work in March 2004 as a dry-cleaning presser and counter worker.  She quit that job in October 2005 and returned to Wal-Mart from November 8 to December 23, 2005.  There is no evidence that she has worked since December 2005.

II.    **Medical Record**

The medical record shows Barnes has been diagnosed with a variety of conditions relevant to her claim for disability.  From 1986 to 1994, well before her alleged date of onset, Barnes was treated by Laura L. Jakious, M.D., for a plethora of conditions including depression and fatigue (Tr. 192-93, 202), scleroderma (Tr. 200, 202), fibrositus (Tr. 198-99), IBS (Tr. 181), mild carpel tunnel syndrome and lateral epicondylitis secondary to overuse syndrome (Tr. 175-78), and inner hear and hearing problems (Tr. 183, 200).  She complained of vertigo, nausea, intermittent tinnitus, and dizziness related to her ear problems and was referred to a specialist who diagnosed her with moderate, mid-frequency, sensorineural loss bilaterally.  Tr. 179, 183, 185.  Dr. Jakious also believed Barnes could be suffering from "possible labrynthitis" or that her "whole constellations [*sic*] of symptoms may also be related to inner ear disturbance, such as Meniere's."  Tr. 183.  Dr. Jakious also referred Barnes to a specialist for evaluation of right lateral epicondylitis and mild carpel tunnel.  The specialist concluded that she suffered from "[r]ight upper extremity overuse syndrome, with evidence of lateral epicondylitis and right shoulder strain with myofascial pain."  Tr. 175-76.  Barnes received a note from Dr. Jakious permitting her to use the restroom when she needs to at work because of her IBS.  Tr. 181.

After 1994, the record is silent for nearly a decade save for one trip Barnes made to the emergency room ("ER") in December 2001 complaining of chest pain and a possible heart attack.  Tr. 205-07.  She reported intermittent pain, no shortness of breath, and denied any history of exertional pain.  She was released after all her tests came back normal and showed no acute coronary syndrome.  An examination of her abdomen revealed the presence of normal bowel sounds and was nontender to palpation.

The medical condition which serves as the focal point of Barnes' disability claim first became apparent in April 2003 when Barnes reported to an ER complaining of dyspnea (shortness of breath) that she had been experiencing all day, most notably with exertion. Tr. 209-10.  An electrocardiogram ("EKG") showed her to be in atrial fibrillation with a rapid ventricular response.  The examining physician was able to lower her heart rate through medication.  Tests revealed elevated liver function tests ("LFTs") and a marked elevation in her glucose levels.  Her abdomen was soft with normal active bowel sounds, nondistended and nontender.  The doctor assessed atrial fibrillation with rapid ventricular response, converted to normal sinus rhythm; mild congestive heart failure, secondary; Type-II diabetes, new onset; Bronchospasm/reactive airway disease; and elevated LFTs.  Barnes was transferred to McKenzie-Willamette Hospital ("McKenzie-Willamette") for further tests and observation.  Tr. 230-32.

At McKenzie-Willamette, Barnes was examined by a number of doctors who administered a battery of tests.  Robert Gunderman, M.D., performed a myocardial perfusion scan with single photon emission computed tomography ("SPECT") and an Adenosine stress test.  Dr. Gunderman's impression was a "large area of infarction involving essentially the entire anterior and lateral walls as well as a large portion of the inferior wall."  Tr. 225.  He found "no reversible ischemic segments," but her "ejection fraction is very low measuring 14% at rest and 21% following stress."  *Id*.  An echocardiogram performed by Jay H. Chappell, M.D., showed "[t]he left ventricle is moderately dilated and mildly hypertrophied with severe global left ventricular hypokinesia and an ejection fraction in the range of 20% or so."  Tr. 222. Dr. Chappell's impression was "[s]evere global hypokinesia," [l]eft ventricluar dilatation

moderate" and "[l]eft ventricular diastolic abnormality."  Finally, Dr. Chappell performed an

Adenosine stress test on Barnes.  Tr. 223.  He indicated that "[d]uring the infusion [Barnes] had

shortness of breath, fatigue and heaviness in her arms.  Frequent premature ventricular

contractions were noted."  *Id*.  His impressions included "[c]linicaly remarkable response to

infusion with symptoms as noted" and "[a]bnormal resting EKG without significant new changes

noted with the infusion."  *Id*.

After Barnes was discharged from McKenzie-Willamette, John W. Gundry, M.D., with

Oregon Cardiology, examined Barnes and conducted a coronary angiography, left ventricular

angiography and right and left heart catheterization.  Tr. 372-75.  The results of these procedures

demonstrated that Barnes' coronary arteries were normal, but that she had severe left ventricular

systolic dysfunction with an ejection fraction estimated in the 10-15% range.  Tr. 371.

Dr. Gundry diagnosed Barnes with nonischemic cardiomyopathy and prescribed several

medications.

Throughout 2003, Barnes continued to see her primary care physician, George Larson,

M.D., who treated her on multiple occasions for extreme fatigue secondary to her heart problems

and assessed her with rheumatoid arthritis.  During this time, he recorded Barnes' weight at

between 206 and 212 pounds.  Tr. 262, 264-65.  Barnes also continued treatment with

Dr. Gundry.  In May 2003, Dr. Gundry commented that standard medical therapy had improved

her activity tolerance considerably, although she still suffered from fatigue while doing chores.

Tr. 370.  In July 2003, Dr. Gundry administered a two-dimensional transthoracic

echocardiogram with color flow and Dopplar.  Tr. 380.  This study showed Barnes' heart was in

a sinus rhythm with frequent premature ventricular complexes ("PVCs").  Her left ventricle was

moderately dilated with mild concentric hypertrophy and severe global hypokinesis with an ejection fraction estimated at 20 to 25%.

On September 23, 2003, Barnes quit her job at Wal-Mart and applied for disability in January 2004, alleging the date of onset as her last day of work. At her hearing before the ALJ, she testified that she quit because she was having a lot of mental and physical problems at the time and did not feel like she could work. Tr. 440.

Barnes again saw Dr. Gundry in November 2003. Dr. Gundry reported that Barnes had nonischemic cardiomyopathy, possible rheumatoid arthritis, possible scleroderma, IBS, and borderline diabetes. Tr. 368. She reported increasing difficulty with dyspnea over the past several weeks and feared it was related to congestive heart failure. Further testing revealed that she was not currently suffering from congestive heart failure. Tr. 367, 369.

The medical record is silent again for over a year. In letters to the Social Security Administration ("SSA"), Barnes reported returning to work in March 2004, though she still suffered from fatigue. Tr. 146-47. Also throughout this period, Barnes reported severe problems with IBS and pain in her side, which, in her opinion, was productive of fecal incontinence and caused her to need to be near a bathroom at all times and, on occasion, to defecate in her pants. Tr. 133-34, 147, 164. She continued to suffer from depression and fatigue. Tr. 135-39.

In March 2005, Barnes returned to Dr. Gundry. Tr. 362. She reported suffering a recent exacerbation of congestive heart failure combined with atrial fibrillation. She also said she had been evaluated at McKenzie Willamette. Though the notes from this hospital visit were not presented to Dr. Gundry, and are not in the record, Dr. Gundry stated that Barnes was "a reliable historian." *Id*. Barnes believed her recent problems were instigated by "some sodium

indiscretion." *Id*.  At the hospital she received an echocardiogram which showed a low ejection

fraction of 20%.  Her physical exam revealed her heart rate was 60 beats-per-minute ("bpm")

with frequent ectopy and her left lower extremity had 1+ edema.  Dr. Gundry performed an EKG

which revealed sinus rhythm with frequent PVCs and an incomplete left bundle branch block.

He assessed her at that time with cardiomyopathy, severe and nonischemic; atrial fibrillation

currently in sinus rhythm; congestive heart failure, symptomatically stable.  He also opined that

"with her low ejection fraction I believe that she should consider disability."  Tr. 363.

One month later, Barnes presented at the McKenzie-Willamette ER complaining of heart

palpitations without chest pain, weakness and slight shortness of breath.  Tr. 323-30.  Her blood

pressure was 134/64; her heart rate was at 165 bpm; and her abdomen was soft, bowel sounds

present, nontender and nondistended.  An EKG revealed atrial fibrillation/flutter with a rapid

ventricular response.  She also had elevated blood sugar.  With medication, her heart rate

returned to its normal sinus rhythm.  She was discharged the same day.

Barnes saw Dr. Gundry for a routine follow-up a week later where she reported that she

continued to have exertional dyspnea, but it had not worsened.  Otherwise she was in stable

health.  Tr. 358-59.  Nevertheless, two days later Barnes presented at the McKenzie Willamette

ER again complaining of atrial fibrillation which was confirmed by EKG.  Tr. 319-21.  Again

her heart rate was returned to normal with medication.  The attending physician noted soft,

nontender abdomen, normal bowel tones and 1 to 2 + pitting edema in her lower extremities.

Barnes returned to the ER two days later with the same complaints.  Tr. 316-17.  The

attending physician noted this was her third visit to the ER in 10 days.  Her heart had irregular

rate and rhythm but no murmur, gallops or rubs.  An EKG showed normal sinus rhythm with

frequent premature ventricular contractions. Barnes was discharged without any additional treatment. The attending physician's impression was "acute palpitations, history of paroxysmal atrial fibrillation and sinus rhythm with frequent premature ventricular contraction ectopy." Tr. 317.

At her next appointment with Dr. Gundry in May 2005, Barnes reported no chest pain, dyspnea or paroxysmal nocturnal dyspnea, although she had occasional momentary palpitation. Tr. 356. She reported that she had initiated the process for disability but was working a few hours a day at a dry cleaning business. She did not perform any heavy lifting and did not feel unusually fatigued at the end of her work day. Dr. Gundry assessed her with cardiomyopathy, atrial fibrillation and congestive heart failure and ordered a Mitigated Acquisition of Blood Pool Images ("MUGA") study to reevaluate her left ventricular ejection fraction ("LVEF"). The test showed an LVEF of 25%, well below the normal range of 50-75%, and "severe left ventricular systolic dysfunction with evidence of left ventricular chamber enlargement and preserved right ventricular systolic function, with normal right ventricular dimensions." Tr. 355.

At her next appointment in June 2005, Dr. Gundry recommended that Barnes consider an implantable cardioverter defibrillator ("ICD"). Tr. 352. He referred Barnes to James McClelland, M.D., who noted that Barnes was a good candidate for an ICD. After discussing the pros and cons, including the increased survival rate for patients with nonischemic cardiomyopathy, Barnes chose to proceed. Tr. 350-51.

A short time later in July 2005 before the IDC could be implanted, Barnes was again admitted to the ER complaining of heart burn and fast pulse. Tr. 299. Barnes reported about 20 episodes of atrial fibrillation in the last two years. The physician noted irregular heartbeat

8 - FINDINGS AND RECOMMENDATION

without murmurs or rubs, and a slightly obese, nontender abdomen with no masses or enlargement. Cardiac monitor interpretation showed a rapid atrial fibrillation rate of 151 bpm without ectopy and an EKG revealed an atrial fibrillation rate of 151 bpm and possible inferior ischemia. Barnes was sedated and the physician attempted synchronous cardioversion four times without success in converting her to normal sinus rhythm. Eventually her atrial fibrillation resolved itself, and Barnes was released.

Barnes followed up her trip to the ER with another visit to Dr. Gundry who noted that she was doing better from a cardiovascular standpoint. Two days later, on July 21, 2005, Barnes received the ICD implant. Tr. 344-45.

In September 2005, Barnes was again admitted to the ER due to a racing heart. Tr. 306-14. She was concerned because her defibrillator had fired eight times in the preceding 24 hours, and she was under stress and not feeling well. A chest x-ray revealed moderate cardiomegaly and pulmonary vascular congestion. On physical examination the attending physician noted a soft, nontender and nondistended abdomen with bowel sounds present. Her EKG revealed atrial fibrillation with a heart rate of 144 bpm which was reduced with medication. The attending physician was able to contact Dr. McClelland who confirmed that the ICD was functioning appropriately. However, Dr. McClelland lowered the firing threshold of around 160 to 180 bpm, which Barnes was hitting with her rapid ventricular response, to 220 bpm. Barnes was released that same day.

Barnes reported the incident to Dr. Gundry, although she stated the ICD fired a total of nine times, and informed him that the settings had been changed to decrease the chance of her getting an inappropriate shock. Tr. 337.

9 - FINDINGS AND RECOMMENDATION

On October 12, 2005, Barnes filled out a recent medical treatment form which indicated that Dr. Gundry was treating her for a worsening of her heart condition and that she was at risk of sudden death syndrome.  Tr. 166.  She reported being on numerous medications to address her heart failure, manic depression and diabetes.

On October 17, 2005, Barnes was treated by advanced registered nurse practitioner ("ARNP") Donna Cash at Oregon Cardiology. Tr. 332-33.  At that time, she reported going through a separation from her husband and losing custody of her child.  She also reported being extremely nervous, high-strung and anxious, and doing relatively well given her circumstances. ARNP Cash noted that Barnes weighed 224 pounds, was in no acute distress, had lungs clear to ascultation and percussion with no use of accessory muscles, no heart lift, rub or murmur, no dependent edema, and an obese abdomen but soft and nontender with bowel tones.  An examination of her ICD showed her heart to be in a sinus rhythm with no pacing; her measured values were stable; and the last episode she had was in September.  She was left on her current medications and told to return in three months.

On December 31, 2005, Barnes wrote another letter to the SSA, relating the September defibrillator incident and a later instance when her defibrillator fired.  Tr. 332.  On December 19, 2005, while at work, she suffered fecal incontinence, felt her heart "flip-flop" and "nearly passed out."  *Id*.  Her ICD fired, and she went to the hospital.  She returned to work the same day, felt weak, and then went back to the hospital.  She worked again from December 21 to 23, 2005, when she experienced another incident of fecal incontinence and made another trip by ambulance to the hospital.  She never returned to work after that and reported returning to the

hospital again on December 26, 2005 due to anxiety about her heart rate.  The record contains no documents concerning these reported trips to the hospital.

The final medical records of relevance are two functional capacity examinations conducted by physicians in March 2006 at the behest of Disability Determination Services ("DDS").  The first was a mental functional capacity, or psychodiagnostic, evaluation conducted by William A. McConochie, Ph.D., who interviewed Barnes for 40 minutes and reviewed her medical records.  Tr. 389-95.  He diagnosed Barnes with cyclothymic disorder, most recently depressed with anger management problems and overspending.  He opined that she had no impairment in her ability to understand and remember instructions or sustain concentration and attention.  She was moderately impaired in her ability to engage in appropriate social interaction.  Dr. McConochie completed a SSA form indicating Barnes' various restrictions.  Tr. 396-98.  In general, he found Barnes had very limited restrictions with marked limitations only in her ability to make judgments on simple work-related decisions and in her ability to respond appropriately to work pressures in a usual work setting.  Otherwise, she had only moderate restrictions in interacting appropriately with the public and supervisors, slight restrictions in interacting appropriately with co-workers, and no restrictions in her ability to respond appropriately to changes in a routine setting or in her ability to understand, remember and carry out short, simple or even detailed instructions.

The second examination addressed Barnes' physical capacity for work and was conducted by Victor K. Lin, M.D., also at the request of DDS.  Barnes related her history of problems including neck pain, back pain, bilateral ankle pain, joint stiffness, bilateral wrist weakness, history of atrial fibrillations and need for a defibrillator which reportedly fired one to

two times per month, manic depression, a diagnosis of scleroderma and a history of IBS. Tr.

399. After completing a full physical examination, Dr. Lin opined that Barnes was restricted in

her ability to work secondary to sclerodactyly, reports of decreased endurance secondary to atrial

fibrillation, and multiple musculoskeletal complaints. He released her to sedentary light physical

work, with further restrictions on fine finger manipulation secondary to her

scleroderma/sclerodactyly. Tr. 402. He found that Barnes could lift 25 pounds occasionally, and

20 pounds frequently; could stand and walk at least 2 hours in an 8-hour work day; could sit

about 6 hours in an 8-hour work day but would need to alternate between standing and sitting;

could occasionally perform the postural activities of balancing, kneeling, crouching, crawling

and stooping but never climbing; was limited in reaching all directions and fingering, but

unlimited in handling and feeling, the former being limited to only occasionally performing

those actions; and she was unlimited in her seeing, hearing or speaking. Tr. 403-06.

After learning that her claim was denied by the ALJ, Barnes submitted an additional

letter maintaining that she continues to suffer from heart problems, severe diarrhea and fecal

incontinence, and acid reflux. Tr. 415-17.

## DISABILITY ANALYSIS

To establish a disability under the Act, a claimant must show that she suffers from a

"medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 USC § 423(a)(1)(A). This impairment must be "of such severity that [the claimant]

is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 USC § 423(d)(2)(A).

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act. 20 CFR § 404.1520; *Bowen v. Yuckert*, 482 US 137, 140-42 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity ("SGA"). If so, then the claimant is not disabled. 20 CFR § 404.1520(a)(4)(I).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month duration requirement. 20 CFR §§ 404.1509; 404.1520(a)(4)(ii). If the claimant does not have such a severe impairment, then she is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals a "listed" impairment in the regulations. 20 CFR § 404.1520(a)(4)(iii). If it does, then claimant is disabled.

If the analysis proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by his impairments. 20 CFR § 404.1520(e); SSR 96-8p, 1996 WL 374184 (July 2, 1996). The ALJ uses this information to determine if the claimant can perform past relevant work at step four. 20 CFR § 404.1520(a)(4)(iv).

If the claimant cannot perform past relevant work, then at step five the ALJ must

determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at

142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 404.1520(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at

1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs

exist in the national economy for the claimant's RFC. *Id.* If the Commissioner meets this

burden, then the claimant is not disabled. 20 CFR § 404.1566.

## ALJ'S FINDINGS

At step one, the ALJ found that, based on her earnings, Barnes had engaged in SGA from

the alleged onset date through December 2005, and, therefore, did not qualify for DIB during

that time period. However, the ALJ found that Barnes had not engaged in SGA for the period

beginning January 1, 2006, through the date of her decision and proceeded to step two for this

time period. Tr. 23-34.

At step two, the ALJ found that Barnes had the severe impairment of cardiomyopathy

with an ejection fraction of 20-25%. The ALJ also found that the remaining impairments

claimed by Barnes either were not supported by the medical record or were not severe

impairments within the meaning of the Act, whether considered independently or in

combination, including: paroxysmal atrial fibrillation, scleroderma or sclerodactyly, non-insulin

dependent diabetes mellitus II, obesity, intermittent diarrhea and cramping, acid reflux, IBS,

hearing loss, rheumatoid arthritis, and depression or cyclothymic disorder. Tr. 24-25.

At step three, the ALJ found that Barnes did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. Specifically, the ALJ considered and rejected Listing 4.08 for Cardiomyopathies, as evaluated under the criteria in Listing 4.04B. Tr. 27.

Because Barnes did not have a listed impairment, the ALJ then assessed her RFC. The ALJ found that Barnes can the RFC to lift and carry 25 pounds occasionally and 20 pounds frequently; can stand/walk at least 2 hours out of an 8-hour workday and sit for 6 hours in a workday, although she needs a sit/stand option at will; can occasionally stoop, crouch, crawl, and kneel; is restricted from climbing; should not be exposed to hazards; and can frequently manipulate with her fingers, but not constantly, and has no limitation on gross manipulation. *Id*. In arriving at this RFC, the ALJ found that while Barnes' medically determinable impairments could reasonably be expected to produce some of the symptoms she alleged, Barnes' statements with respect to the intensity, persistence and limiting effects of her symptoms were not entirely credible.

At step four, the ALJ found that Barnes could perform her past relevant work as a dry cleaner helper as she actually performed it and, therefore, was not disabled. Tr. 26.

Although the disability analysis would ordinarily end at this point, the ALJ continued to step five in order to "give the claimant every benefit of the doubt." Tr. 28. Considering Barnes' age, education, work experience, and RFC, as well as the testimony of a vocational expert ("VE"), the ALJ determined that jobs exist in significant numbers in the national economy that Barnes can perform, including a ticket seller, small products assembler, and electronics worker.

15 - FINDINGS AND RECOMMENDATION

Tr. 28-29.  This reaffirmed the ALJ's conclusion that Barnes was not under a disability as defined by the Act from September 23, 2003, through the date of her decision.

## BARNES' CHALLENGES

Although she advances a number of challenges to the ALJ's determination, Barnes has two primary complaints:  (1) the ALJ failed to properly develop the record and, in fact, hindered its development by making misleading statements to her; and (2) the ALJ failed at step three to evaluate whether the combination of her impairments *equaled* a listed impairment, in particular by failing to evaluate the severity and effects of her obesity on her disability in violation of  SSR 02-01p, 2000 WL 628049 (Sept. 12, 2002).  Barnes contends that the ALJ should have found that she met Listing 4.08, and that the ALJ's decision to the contrary should be reversed with the case remanded for an immediate award of benefits.  Alternatively, Barnes argues that the case should be reversed and remanded to remedy the alleged procedural deficiencies.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it applies proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Bayliss v. Barnhart*, 427 F3d 1211, 1214 n1 (9th Cir 2005) (internal quotation marks and citation omitted).  "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Orn v. Astrue*, 495 F3d 625, 630 (9th Cir 2007), quoting *Burch v. Barnhart*, 400 F3d 676, 679 (9th Cir 2005).  This court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir

2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not

substitute its judgment for that of the Commissioner.  *Id,* citing *Robbins v. Soc. Sec. Admin.*, 466

F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a

rational reading.  *Batson*, 359 F3d at 1193.

**FINDINGS**

**I.**      **Step One Finding**

     The record shows that Barnes engaged in SGA between the date of her alleged onset

through a period ending in December 2005.  Barnes does not challenge the ALJ's findings with

respect to her earnings and does not contend that she was paid more than the value of her work.

Therefore, the Commissioner's decision with respect to this time period should be affirmed.

20 CFR 404.1520(a)(4)(I), (b).

**II.**      **Step Three Finding**

     At step three when evaluating whether Barnes condition met one of the listed

impairments beginning January 1, 2006, the ALJ focused on Listing 4.08.  Neither the

Commissioner nor Barnes have challenged the ALJ's use of Listing 4.08, apparently based on

the Commissioner's view that although it "was removed from the listings after 2006, it was in

effect at the time of the ALJ's decision and directed that cardiomyopathy impairments be

evaluated under 4.02, 4.04, 4.04, or 11.04."  Defendant's Brief, p. 8 n2, citing 20 CFR Pt. 404,

Subpt. P, app. 1, § 4.08 (2006).  Former Listing 4.08 read:  "Cardiomyopathies, documented by

appropriate imaging techniques or cardiac catheterization.  Evaluate under the criteria in 4.02,

4.04, 4.05, or 11.04." *Id*.  According to the Commissioner, the ALJ properly evaluated Barnes'

cardiomyopathy under Listing 4.04 as instructed by this "reference listing."

The Commissioner is incorrect.  Listing 4.08 was removed from the regulations prior to

the ALJ's decision dated September 19, 2006, by changes made to the cardiovascular listings

which went into effect on April 13, 2006.  *Revised Medical Criteria for Evaluating*

*Cardiovascular Impairments*, 71 Fed Reg 2312-01, 2006 WL 63805 (Jan. 13, 2006) (effective

April 13, 2006).  This change was part of a comprehensive revision made by the SSA to the

criteria in the Listing of Impairments used to evaluate claims for cardiovascular impairments.  *Id*.

The revision requires the agency to apply these new rules to "claims pending before [the

agency]" at the time of the rule change.  *Id* at 2313.  A claim is pending until the

Commissioner's final decision.  *Id*.  Accordingly, this court must review the Commissioner's

final decision "in accordance with the rules in effect at the time of the administrative law judge's

(ALJ) decision, if the ALJ's decision is the final decision of the Commissioner."  *Id.*  The ALJ's

decision dated September 19, 2006, became the final decision of the Commissioner after the

Appeals Council denied review.  Therefore, this court must review this case using the regulations

in effect on September 19, 2006.

The regulations in effect on September 19, 2006, do not include Listing 4.08.  The SSA

specifically addressed the changes made to Listing 4.08 in its summary of the 2006 amendments:

"[P]rior listing 4.08, for cardiomyopathies, was a reference listing that required evaluation under

listings 4.02, . . . 4.04, . . . 4.05, . . . or 11.04 . . . ."  71 Fed Reg at 2313.  The summary

continues:  "Instead of using reference listings, we are providing guidance in the introductory

text stating that these impairments should be evaluated under the criteria for the affected body

18 - FINDINGS AND RECOMMENDATION

system." *Id*.  Subsection H of the introductory text to the cardiovascular system listings instructs the ALJ to "evaluate cardiomyopathy under 4.02, 4.04, 4.05, 4.06, or an appropriate neurological listing in 11.00ff."  20 CFR Pt. 404, Subpt. P, App.1, § 4.00H.3.  Since the revisions reference the same listings as were referenced in former Listing 4.08, the analysis appears to remain the same as employed by the ALJ.  However, this is not a mere curmudgeonly exercise in citation accuracy due to the substantial changes also made to Listing 4.04 effective April 13, 2006.

Based on the reference in Listing 4.08, the ALJ evaluated Barnes' impairment under subsection B of former Listing 4.04.  That subsection sets forth the following three criteria which had to be met in order to meet this listing and, as a consequence, former Listing 4.08:

> B.  Impaired myocardial function, [1] documented by evidence (as outlined under 4.00C3 or 4.00C4b) of hypokinetic, akinetic, or dyskinetic myocardial free wall or septal wall motion with left ventricular ejection fraction of 30 percent or less, and [2] an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, and [3] resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest[.]

20 CFR Pt. 404, Subpt. P., App. 1, § 4.04B (effective through April 12, 2006).

The ALJ's analysis was premised on these criteria, finding that Barnes did not meet the second and third criteria.  Furthermore, the parties' arguments focus on whether the medical evidence shows that Barnes meets these criteria or whether the ALJ made some procedural error which prevented Barnes from having an adequate opportunity to prove that she met these criteria.        Unfortunately, the same changes that eliminated Listing 4.08 also substantially revised Listing 4.04.  The language in former Listing 4.04 is not found in revised Listing 4.04.

 In order to meet Listing 4.04B as it existed at the time of the ALJ's decision, Barnes would have

had to prove that she had:

> 4.04 Ischemic heart disease, with symptoms due to myocardial ischemia,
> as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment
> (see 4.00B3 if there is no regimen of prescribed treatment), with one of the
> following:
>
> * * *
>
> B. Three separate ischemic episodes, each requiring revascularization or
> not amenable to revascularization (see 4.00E9f), within a consecutive
> 12-month period (see 4.00A3e).

20 CFR Pt. 404, Subpt. P, App. 1, § 4.04B (effective April 13, 2006).

As can be seen from the summary of the record, Barnes' claim cannot be analyzed under

revised Listing 4.04B since her condition is repeatedly identified as *non*ischemic

cardiomyopathy, and nothing in the record suggests that she experiences ischemic episodes.

Tr. 322-33, 344-45, 350-53, 362-63, 368, 370, 374-75.

Instead, it now appears that the most applicable listing for Barnes is revised Listing 4.02

based on its inclusion of a criteria of a low "ejection fraction:"

> 4.02 Chronic heart failure while on a regimen of prescribed treatment,
> with symptoms and signs described in 4.00D2. The required level of
> severity for this impairment is met when the requirements in both A and B
> are satisfied.
> A. Medically documented presence of one of the following:
>> 1. Systolic failure (see 4.00D1a(I)), with left ventricular end diastolic
>> dimensions greater than 6.0 cm or ejection fraction of 30 percent or less
>> during a period of stability (not during an episode of acute heart failure);
>> or
>> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall
>> plus septal thickness totaling 2.5 cm or greater on imaging, with an
>> enlarged left atrium greater than or equal to 4.5 cm, with normal or
>> elevated ejection fraction during a period of stability (not during an
>> episode of acute heart failure); AND
> B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

    a. Dyspnea, fatigue, palpitations, or chest discomfort; or
    b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or
    c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or
    d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

These criteria closely resemble those under former Listing 4.04B. 20 CFR Pt. 404, Subpt. P, App. 1, § (4.02). Both former Listing 4.04B and the combination of the criteria found at revised Listing 4.02A.1 and B.1 create similar three-part tests for analysis of cardiomyopathy. However, the language on the functional component of the test under 4.02B.1 has been altered from that found in former Listing 4.04B and was not considered by the ALJ in reaching her conclusion. In addition, Listing 4.02 B.2 and B.3 provide two new additional ways a claimant can prove the functional component of the listing which were not available under former Listing 4.04B. Obviously, the ALJ did not consider these.

21 - FINDINGS AND RECOMMENDATION

Because the ALJ analyzed Barnes' claims using outdated and inapplicable regulations, her opinion is premised on legal error. Therefore, it must be reversed with respect to the portion of the analysis covering January 1, 2006, through the date of her decision. The parties did not notice this error and hence did not address its implications. Therefore, it is unknown what additional ramifications this error may have had on the ALJ's decision. For example, Barnes' charge that the ALJ failed to fulfill her responsibility to complete the record may take on new meaning in light of additional or different criteria which should have been applied to her claim. It is premature, however, for this court to speculate what the reverberations of this error may be throughout the ALJ's step-three analysis.

It also is inappropriate to consider, in the first instance, whether the medical evidence before the ALJ establishes that Barnes satisfies any of the listings found in the regulations actually in effect on the date of the ALJ's decision. This court's role in the disability process is to assess whether the Commissioner's decision that the claimant is not disabled, a decision committed to his discretion (*see* 42 USC § 405(b); 20 CFR § 404.1527(3)), is supported by substantial evidence in the record as a whole and free of legal error. *Tackett*, 180 F3d at 1097. If either of these conditions is not met, this court may set aside the Commissioner's decision. *Reddick*, 157 F3d at 720. However, this court's authority to remand for an award benefits is limited to those instances where it is clear from the substantial evidence in the record, that the claimant is entitled to benefits:

> [Courts] may direct an award of benefits if the record has been fully developed and further administrative proceedings would serve no useful purpose. Such a circumstance arises when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a

22 - FINDINGS AND RECOMMENDATION

> determination of disability can be made; and (3) it is clear from the record
> that the ALJ would be required to find the claimant disabled if he
> considered the claimant's evidence.

*McCartey v. Massanari*, 298 F3d 1072, 1076-77 (9th Cir 2002) (internal citation omitted), citing

*Smolen v. Chater*, 80 F3d 1273, 1292 (9th Cir 1996).

Here it is not clear from the record that Barnes is entitled to benefits and there are

outstanding issues to resolve on remand, including whether, after a consideration of the

regulations in force at the time of the ALJ's decision, Barnes' condition meets or equals a listed

impairment.  On remand, the ALJ will need to determine whether the medical record supports a

finding that any of the functional criteria in revised Listing 4.02 (or any other applicable listing)

are met or whether additional evidence is needed to complete the record.  However, this court

does not suggest that the scope of the review on remand is limited to a mechanical application of

the facts in the record to the correct edition of the regulations or to only a consideration of

revised Listing 4.02 .  Upon consideration of the proper regulations, the ALJ may need to seek

out additional evidence to fulfill her duty "to scrupulously and conscientiously probe into,

inquire of, and explore for all the relevant facts," in light of the criteria set forth in Listing 4.02,

*Celaya v. Halter*, 332 F3d 1177, 1183 (9th Cir 2003), or may determine that a different listed

impairment applies.  Alternatively, in view of the applicable regulations, the ALJ may determine

that the record is sufficient to permit an adequate determination on the evidence already in the

record.  Regardless, it is the Commissioner, and not this court, who must conduct the initial

analysis under the proper regulations.

## RECOMMENDATION

23 - FINDINGS AND RECOMMENDATION

The Commissioner's decision should be AFFIRMED with respect to the period from September 23, 2003, through December 31, 2005, REVERSED with respect to the period from January 1 to September 19, 2006, and REMANDED for consideration of Barnes' disability under the regulations in effect on the date of the ALJ's decision.

## **SCHEDULING ORDER**

Objections to the Findings and Recommendation, if any, are due September 19, 2008.  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 4th day of September, 2008.


/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge